**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GENE CAHILL on behalf of LINDSAY CAHILL, a minor,** | ) |
| | ) |
| | )    **2:08-cv-1552** |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **LIVE NATION, HANOVER TOWNSHIP, WASHINGTON COUNTY, PENNSYLVANIA, CHIEF GEHO and OFFICER ZOLLER,** | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court are the MOTION FOR SUMMARY JUDGMENT (Document No. 72) filed by Defendant Live Nation Worldwide, Inc. ("Live Nation") and the MOTION FOR SUMMARY JUDGMENT (Doc. No. 76) filed by Defendants Hanover Township and Chief Geho. Defendant Police Officer Julius Zoller has not moved for summary judgment. Defendants have filed Concise Statements of Material Facts, exhibits, and memoranda of law in support of their respective motions (Doc. Nos. 73-75, 77-79). Plaintiff Gene Cahill, on behalf of his minor daughter Lindsay Cahill, has filed various responses in opposition (Doc. Nos. 84 – 87 & 89). Reply briefs were filed by Defendants Hanover Township and Chief Geho and Defendant Live Nation at Doc. Nos. 98 and 101 - 102. Plaintiff filed a sur-reply brief with appendix and supplement at Doc. Nos. 103 – 105, to which Defendants Hanover Township and Chief Geho filed a sur-sur reply at Doc. No. 106. Clearly, the issues have been fully briefed by both parties. The motions are now ripe for disposition.

## Factual Background

Live Nation is a private corporation that operates the Post-Gazette Pavilion. Live Nation's predecessor-in-interest and Hanover Township entered into a contract under which the Township agreed to provide part-time police officers for traffic and crowd control for events at the Post-Gazette Pavilion. The contract specifies that the police officers are "independent contractors" and shall not be deemed to be employees of Live Nation. This case arose from the events of July 29, 2008. On that day, Lindsay Cahill attended a "Warped Tour" concert at the Post-Gazette Pavilion, an event after which the Defendant police officers were directing traffic. Plaintiff alleges that she was subjected to excessive force and cited for disorderly conduct as she attempted to meet her ride home. The police officers contend that Ms. Cahill was creating a traffic jam by blocking traffic, ignored Officer Zoller's directives and responded with defiant obscenities. While neither of the two motions for summary judgment currently before the Court was filed by either of the two individual officers, the specifics of the interaction between the officers and Ms. Cahill, from which the allegation of excessive force stems against Officer Zoller, warrants summary here.

As a threshold matter, the Court notes that Defendant police officer Jesse Haschak, one of the two police officers involved in the incident with Plaintiff Lindsay Cahill on the night in question, was voluntarily dismissed from the case by stipulation of the parties. *See* Doc. Nos. 70 & 71. Further, the Court notes that the parties disagree with respect to the specific actions and conduct of Lindsay Cahill and Defendant police officer Zoller during the incident. What is not in dispute, however, is that no Defendant other than Zoller and Haschak were active in the incident itself. After the concert, Lindsay Cahill was waiting for a ride home. Police officers Zoller and

2

Haschak were directing the traffic out of the Post-Gazette Pavilion parking areas. One particular single lane not being used by traffic exiting the parking area, referred to by the parties as a "fire lane", is where the incident between Lindsay Cahill and the officers occurred. From this point, the versions of what happened diverge.

According to Plaintiff, Lindsay Cahill was standing in the vicinity of the fire lane and waiting for a vehicle which had previously left the parking area to return to the parking area to pick her up. As the vehicle approached, Lindsay moved into the "fire lane" so that she could meet it. No other traffic was in the fire lane at that point, nor was any other vehicle approaching other than the vehicle approaching to retrieve her. She heard a command not to be in the fire lane, or words to that effect, in response to which, she entered the vehicle in the seat directly behind the driver. At that point, according to Lindsay, Officer Zoller approached, pounded on the windows, and forcibly removed her from the vehicle before she had a chance to exit on her own.

Not surprisingly, Defendant Zoller's description of what occurred differs. According him, the lane in question was not the "fire lane", but a lane next to the fire lane that was specially designated for the use of parents and other drivers to enter the parking area in order to pick up underage guests and other attendees who did not drive. *See* Doc. No. 79 at exhibit 3. When Officer Zoller noticed Lindsay Cahill, she was talking on her cell phone and standing alongside a vehicle stopped in this special lane, which happened to be the vehicle that was there to pick her up. According to Officer Zoller, the stopped vehicle was causing the other traffic that was attempting to enter the parking area to pick up other passengers to come to a standstill, which, in turn, caused the outbound traffic to stop because it was blocked by the inbound traffic stopped behind the vehicle stopped next to Lindsay Cahill. *Id*. After seeing the traffic "piling up", Officer Zoller

3

blew his whistle in the direction of Lindsay Cahill, in an attempt to get her to move out of the way. *Id*.   She did not move, although it is not clear with this record whether she heard the whistle or not. He blew his whistle a second time, to which, Lindsay Cahill looked in his direction, saw that he was motioning for her to move to the side, responded with vulgar language and yet otherwise ignored the signal to move out of the way.   *Id*.   Officer Zoller blew his whistle a third time, to which Cahill once again responded with similar behavior.   At this point, officer Zoller approached the vehicle, saw that the driver's head was protruding through the open driver's side window, and ordered the driver the move the vehicle to the side.   He also observed that Lindsay Cahill was still not moving away from the vehicle, and informed her that she was going to be cited for disorderly conduct.   Lindsay then entered the vehicle, and the driver closed all windows and locked the doors.   Officer Zoller twice ordered the driver to unlock the doors, which the driver did.   Officer Zoller opened the back door and ordered Lindsay Cahill out of the back.   She refused, and "was kicking, throwing her arms, screaming, throwing fists, just acting up."   *Id*. at Tr. p. 84.   Officer Haschak also had approached the vehicle at this point.   Next, Lindsay was removed from the back of the vehicle, with varying descriptions of Lindsay's level of resistance, the amount of force used, and other such details not germane to the motions for summary judgment at hand.   What resulted from this exchange was the issuance of a non-traffic citation to Lindsay for disorderly conduct.

To be clear, the Court does not mean to imply that the facts of the incident as described are not in dispute, as they clearly are.   The different accounts are included here, however, because in either case, there are facts not in dispute which bear upon the pending motions.   Particularly, this incident involved a finite group of individuals, Lindsay Cahill and Officer Zoller, Officer Haschak

4

and the occupants of the vehicle. Further, both Lindsay Cahill and Officer Zoller's respective versions of what occurred include Lindsay Cahill traversing a lane of traffic to enter a vehicle that was returning to the Post-Gazette Pavilion, at least one oral command from Officer Zoller for her not to be in the lane, and her entry into and subsequent removal from the vehicle. More germane to the motions for summary judgment, however, is the fact that no private employees of Defendant Live Nation or any other employee of Chief Geho or Hanover Township were actively involved with the incident itself.

**Standard of Review**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure of material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the court must "'view the evidence ... through the prism of the substantive evidentiary burden' to determine 'whether a jury could reasonably find either that the plaintiff proved [their] case by the quality and quantity of evidence required by the governing law or that [they] did not.'" *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' ... that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried this burden, then the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir.1993). Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue of fact for trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir.1994)).

Moreover, in considering a motion for summary judgment, a district court may not "make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [their] favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *see also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir.2001) (holding that "a court must take the facts in the light most favorable to the nonmoving party, the [Plaintiffs], and draw all reasonable inferences in their favor") (citation omitted).

### Legal Analysis

Plaintiff, on behalf of his daughter, brings three counts against Defendant Live Nation, one against Defendant Police Officer Zoller, and one against Defendants Hanover Township and Chief Geho. *See* Doc. No. 39. Of the three counts alleged against Defendant Live Nation, one alleges a violation of Lindsay Cahill's constitutional rights under the Due Process Clause of the Fourteenth Amendment, while the other two allege causes of action under Pennsylvania common law. Similarly, the counts alleged against the other three Defendants allege constitutional deprivations.

The Court's analysis will follow the sequence as the counts are alleged.

A. Section 1983 liability for Defendant Live Nation

Plaintiff brings a section 1983 claim for violation of the due process clause of the Fourteenth Amendment against Defendant Live Nation. *Id.* at ¶¶ 32 − 36. Generally, 42 U.S.C. § 1983 does not create substantive rights, but rather provides a remedy for a violation of rights created by federal law or the Constitution of the United States. 42 U.S.C. § 1983; *City of Okl. City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

To establish a Section 1983 claim, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation [violation of a right] was committed by a person acting under the color of state law." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996).

Here, Defendant Live Nation is a corporate private party, not a government entity, and therefore is only liable under Section 1983 if it is "fairly said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Courts have found a private party "fairly said to be a state actor" under a variety of tests. Under one such test, a "close nexus test", a private party may be a state actor where "there is a sufficiently close nexus between the state and the challenged action of the [private] entity so that the action of the latter may fairly be treated as that of the state itself." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)(quotation omitted); *see also*, *Jackson v. Metro. Edison Co.*, 419 U.S.

345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). A second test, the "symbiotic relationship test" occurs where "the state has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that a privately owned restaurant's refusal to serve an African American customer constituted state action where the restaurant leased space from a parking garage owned by state agency). There is a "joint action test" where a private party is a "willful participant in joint action with the State or its agents." *Lugar*, 457 U.S. at 941, 102 S.Ct. 2744 (1982). Although wholly inapplicable given the facts of this case, the Court also notes the "public function test", where the private party has been "delegated ... a power 'traditionally exclusively reserved to the State.'"[1] *Terry v. Adams*, 345 U.S. 461, 468-470, 73 S.Ct. 809, 97 L.Ed. 1152 (1953)(quotation omitted)(state action found where private actor administered election of public officials); *see also*, *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

Notwithstanding the existence of the so-called "tests" within the common law, no single method of analysis determines the presence of state action in § 1983 cases. *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 98 (3d Cir.1984). In the state action inquiry, "more than one test may be relevant ... the tests may overlap, and one or more prongs of one test may be irreconcilably inconsistent with the prong of another." *Onoufrious Spyros v. Kimball*, 813 F.Supp. 352, 357 (E.D.Pa.1993). The analysis depends on the facts and circumstances of each case. *Burton*, 365

---

1       The requisite facts and circumstances needed to underpin the public function test are rare occurrences and, as such, the test is difficult to satisfy. "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *see e.g.*, *Marsh v. Alabama*, 326 U.S. 501, 505-09, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (operation of a company owned town is traditional government function); *Evans v. Newton*, 382 U.S. 296, 298-302, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (management of a city party is a traditional government function).

U.S. at 722, 81 S.Ct. 856. Ultimately, these "tests" are simply methods to consider whether a private defendant has somehow improperly wielded a degree of power and authority belonging to the state to unlawfully deprive another of constitutional protections. Terms such as "close nexus", "symbiotic relationship", "joint action", or "public function" are little more than descriptions of the various means recognized by courts to identify an unlawful deprivation of constitutional rights by a private party. Under any analysis, however, there must be no genuine issue with respect to the question of whether a private defendant actively exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. *Accord. Groman v. Twp. of Manalapan*, 47 F.3d 628, 639 n. 17 (3d Cir.1995).

Plaintiffs claim that state action applies to Defendant Live Nation due to its joint participation in an arrangement with the Hanover Township police underpinning the challenged activity, namely the use of police power of the state to 'enforce the in-house rules' of the Post-Gazette Pavilion. *See* Doc. No. 87 (referencing *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d (1966)("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."); *see also*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg

policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, or to cause her subsequent arrest.")   In support of that general premise, Plaintiff points to a number of aspects of the relationship between Live Nation and Hanover Township to demonstrate the requisite close relationship between the two, including the structure of the agreement between Hanover Township and Live Nation whereby Chief Geho was mutually appointed as the "Manager" to coordinate, schedule, and supervise the officers, and that Live Nation was responsible for paying a portion of the compensation of the officers.   *Id.*

As such, the Court turns to the "joint action" test applied by the U.S. Court of Appeals for the Third Circuit in *Cruz v. Donnelly*, 727 F.2d 79 (3d Cir. 1984)(per curiam).[2]   In *Cruz*, store employees became suspicious of a shopper and contacted two police officers who "forcibly escorted Cruz to the store manager's office."   727 F.2d at 79.   Once inside the office, the store manager accused Cruz of shoplifting, and "ordered and commanded" the police to strip search Cruz for stolen items.   *Id.*   When no goods were found, Cruz filed a Section 1983 action against the store employees and police alleging unlawful detention and search.   *Id.*   In moving for summary judgment, the operator of the retail food chain and the individual store employee argued that the shopper could not state a Section 1983 claim against the employees because the employees were not state actors.   *Id.*   The Court of Appeals established a two-part test to determine whether a business acts under color of state law, holding that there is no § 1983 liability for the private entity unless:   (1) the police have a pre-arranged plan with the business; and (2) under the plan, the police will arrest anyone identified by the store without independently evaluating the presence

2        *Cruz* no longer states good law insofar as there is no longer any heightened pleading standard required for section 1983 actions.   *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).   No Supreme Court or reported Third Circuit decision, however, has modified the substantive standard established in *Cruz*.

of probable cause that a crime has been committed. *Id.* at 81.

In reaching its decision, the Court of Appeals relied upon the United States Supreme Court's decision in *Lugar v. Edmondson Oil Co.*[3] *Id.* (referencing *Lugar, infra.,* 457 U.S. at 942, 102 S.Ct. 2744). "*Lugar* teaches that at least when the state creates a system permitting private parties to substitute their judgment for that of a state official or body, a private actor's mere invocation of state power renders that party's conduct actionable under § 1983." *Cruz*, 727 F.2d at 82. Key to the analysis beyond the existence of a private party/public authority arrangement is the additional requirement of a private party's judgment serving as the deciding impetus for the specific state action being taken. To wit, *Cruz* arose in the context of an agreement between a state official and private party to replace the discretion of the state official with that of the private store owner, and the deciding inquiry was whether the state official surrendered the exercise of its official judgment to a private party, either pursuant to an agreement or statute, thus turning the private party into a state actor. *Cf. Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989) (finding no state action where state official used independent judgment, rather than the judgment of a private party, in issuing citations to protesters violating preliminary injunction); *Howerton v. Gabica*, 708 F.2d 380, 385 (9th Cir.1983)(finding state action based on police intervention at "every step" of eviction).

Applying the "joint action" test here, the Court finds that Defendant Live Nation was not a state actor given the fact that there is no evidence that the judgment of the Hanover Police

---

3    In *Lugar*, the Court held that a private individual who sought prejudgment attachment of another's property, pursuant to a state statute which allowed for attachment based on one party's ex parte application, was a state actor. *Id.* Specifically, under this statute, a private party's allegations that an individual was disposing or may dispose of property in order to defeat creditors, triggered an automatic requirement that the County Sheriff execute prejudgment attachment of the individual's property. *Id.* at 924, 102 S.Ct. 2744. Because the County Sheriff did not use his own judgment in determining whether to execute prejudgment attachment against the individual, but rather acted upon the direction of the private party's ex parte petition, the private party was deemed a state actor. *Id.* at 942, 102 S.Ct. 2744.

Department in general much less that of the two individual officers involved with Lindsay Cahill was replaced by the judgment of Defendant Live Nation. As Defendant Live Nation notes, the evidentiary record establishes that the Hanover Township police were expected to use their independent judgment, evaluation of the situation and experience and training they received as police officers when handling any situation that arose at the Post-Gazette Pavilion. There is no evidence that any of Defendant's employees played any role in initiating the encounter between Lindsay Cahill and Officer Zoller and/or Officer Haschak, much less that Defendant Live Nation told or directed Officer Zoller and/or Officer Haschak how to handle the situation with Lindsay Cahill. Further, there is no evidence that Officer Zoller and/or Officer Haschak failed to use their independent judgment during the incident, or that they substituted Defendant's judgment for their own in connection with the events which form the basis of the action.

Plaintiffs emphasize the structural relationship, defined by the contract between Live Nation and the Hanover police department, for the contention that they should be considered "joint employers." *See* Doc. No. 87. Along those same lines, Plaintiff argues that Defendant Live Nation exercised a degree of control over the performance of the police officers to such a degree that the officers should not be considered independent contractors. *Id.* This argument misses the point that, for the purpose of attaching section 1983 liability to a private actor for actions allegedly taken under the color of state law, the focus is on the specific constitutional deprivation as alleged, and not the more general employment arrangement. To hold otherwise would obliterate the second element of the "joint action" test, and would essentially attach *respondeat superior* liability to the private actor, which cannot serve as the basis for 1983 liability. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691, 694, 98 S.Ct. 20-18, 2037–2038, 56 L.Ed.2d 611

(1978).   As *Cruz* illustrates, it is not enough that an arrangement existed between the police and a private party that would place police in and around private property.   The private party's judgment, as opposed to the state acting police officer's judgment, would have to have caused the deprivation.   While there is no doubt that a contractual relationship existed, nowhere in the record is there evidence to establish that it was decision of Defendant Live Nation, and not the independent determination of the individual officers, to approach and cite Lindsay Cahill on June 29, 2008.   Furthermore, there is no evidence in the record that it was the judgment of Defendant Live Nation, and not that of the individual police officers, that resulted in the citation for disorderly conduct.   In fact, the very language of the citation demonstrates that Lindsay Cahill was cited for disobeying the order of Officer Zoller not to be in the particular lane of traffic, for disobeying the order of Officer Zoller not to get into the vehicle, for using vulgar language with Officer Zoller, for disobeying the order of Officer Zoller to get out of the vehicle, and for resisting both officers' attempts to restrain her.   *See* Doc. No. 79 at exhibit 2.

In sum, the Court finds that Plaintiffs have adduced no evidence to demonstrate that "the police substituted the judgment of private parties for their own official authority."   To the contrary, it was the alleged actions of Officer Zoller, in the form of his own individual observations and orders to Lindsay Cahill, that resulted in the citation and alleged constitutional deprivations.   While Plaintiff disagrees with the Zoller version of what occurred, the record does not reveal a genuine issue of material fact as to the second element from the "joint action" test articulated by the Court of Appeals in *Cruz*.

As such, the motion for summary judgment filed by Defendant Live Nation on the section 1983 claim will be granted.

B.  Liability of Defendant Live Nation, Inc. under theories of state law liability

Plaintiff brings two separate counts against Defendant Live Nation under theories of liability existing under Pennsylvania law.  *See* Doc. No. 39 at ¶¶ 37 − 40 and ¶¶ 41 − 42.  Plaintiff initially alleges that Defendant Live Nation was negligent in the hiring, and in the supervision and/or regulation of the Hanover police officers (*id.* at ¶¶ 37 − 40).  Generally speaking, negligent hiring or supervision involves the breach of an employer's duty to abstain from hiring an employee and placing that employee in a situation where the employer knows or should know the employee will harm a third party or the breach of an employer's duty to monitor and control the activities of an employee.  *See Hutchison ex rel. Hutchison v. Luddy*, 560 Pa. 51, 742 A.2d 1052, 1059-60 (Pa.1999) (affirming use of common law and Restatement (Second) of Torts § 317 liability standards for negligent supervision case).

Plaintiff next alleges that Defendant Live Nation is vicariously liable or strictly liable "for the common law torts perpetrated by its employees and/or agents in the performance of security duties" (*id*. at ¶42).  An employer is held vicariously liable in Pennsylvania for the negligent acts of an employee that cause injuries to third parties, provided that such acts were committed during the course of and within the scope of employment.  *See Joseph M. v. Northeastern Educational Intermediate Unit 19*, 516 F.Supp.2d 424, 445 (M.D.Pa.2007); *Valles v. Albert Einstein Med. Center*, 758 A.2d 1238, 1244 (Pa.Super.Ct.2000).  This rule applies to intentional as well as negligent conduct.  *Costa v. Roxborough Mem. Hosp.*, 708 A.2d 490, 493 (Pa.Super.Ct.1998).

Defendant Live Nation moves for summary judgment on both state law claims on a number of bases.  It contends that it cannot be legally responsible for harm allegedly caused by the two officers because the officers were not employees, but were independent contractors.  Doc. No. 73

at pp. 14 – 15.   Further, Defendant avers that a private citizen is not responsible for any tortious acts a police officer might have engaged in while performing official duties for the public.   *Id*. at p. 15 (citing *Kirkpatrick v. Alan Wood Steel Company*, 338 Pa. 126, 12 A.2d 22 (1940)).

The Court must apply Pennsylvania state law to Plaintiff's common law tort claims through the exercise of its supplemental jurisdiction.   *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 118 S.Ct. 2047, 2051-2052, 141 L.Ed.2d 364 (1998).   In doing so, the law as announced by the Pennsylvania Supreme Court will be applied.   *See, e.g., Aceto v. Zurich Ins. Co.*, 440 F.2d 1320, 1321 (3rd Cir.1971);   *Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177-178, 61 S.Ct. 176, 85 L.Ed. 109 (1940).   In order to recover under either theory of liability, Plaintiff must prove the elements of a cause of action for negligence, i.e., "that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage."   *Martin v. Evans*, 551 Pa. 496, 502, 711 A.2d 458, 461 (1998); *see also, Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 45, 2000 WL 778226, at *9 (Pa.Super.2000) ("absent a finding of negligence, the negligent infliction of emotional distress claim cannot survive").

The element of causation lies at the heart of Plaintiff's two state law claims.   It is not sufficient that an allegedly negligent act may be viewed, in retrospect, to have been one of the happenings in the series of events leading up to an injury.   Even if the requirement of actual causation has been satisfied, there remains the issue of proximate or legal cause.   *See Reilly v. Tiergarten Inc.*, 430 Pa.Super. 10, 14-16, 633 A.2d 208, 210 (1993) ("[t]o satisfy the requirement of causation, the complainant must demonstrate that the breach was both the proximate cause and the actual cause" of the injury)(citation omitted).   While actual and proximate causation are

"often hopelessly confused", a finding of proximate cause turns upon:

> whether the policy of the law will extend the responsibility for the [negligent] conduct to the consequences which have in fact occurred.... The term 'proximate cause' is applied by the courts to those more or less undefined considerations which limit liability even where the fact of causation is clearly established.

*Bell v. Irace*, 422 Pa.Super. 298, 301-03, 619 A.2d 365, 367 (1993) (quoting W.P. Keeton, *Prosser & Keeton, The Law of Torts* (5th ed.1984)).

Proximate cause "is primarily a problem of law." *Id.* Thus, proximate cause must "be determined by the judge and it must be established before the question of actual cause is put to the jury." *Reilly*, 633 A.2d at 210. Accordingly, courts are required to make the threshold determination of whether a defendant's conduct, or alleged breach of duty, could constitute the proximate, or legal, cause of the plaintiff's injury. *Brown v. Philadelphia College of Osteopathic Medicine*, 760 A.2d 863, 868 (Pa.Super.2000); *Midgette v. Wal-Mart Stores Inc.*, 317 F. Supp.2d 550, 563 (E.D. Pa. 2004) (holding that store's failure to train employees on how to recognize and address domestic abuse and to have adequate work place security could not constitute proximate cause of harm suffered by female employee who was shot by her abusive husband in defendant's store after he purchased ammunition there), *aff'd.*, 121 Fed. Appx. 980 (3d Cir. 2005). Where the remoteness of a causal connection between the defendant's conduct and the harm suffered is so clear that a jury could not reasonably differ on the question of causation, it is the function of the court to decide the issue of causation as a matter of law. *See Brown*, 760 A.2d at 868-69; *Askew by Askew v. Zeller*, 361 Pa. Super. 35, 42, 521 A.2d 459, 463 (1987); *Boice v. Tyler Memorial Hospital*, 2007 WL 2903424 at *6 (M.D. Pa. 2007) (Vanaskie, J.).

The Pennsylvania Supreme Court has adopted the analysis of "legal cause" set forth in the Restatement of Torts. *See Ford v. Jeffries*, 474 Pa. 588, 594, 379 A.2d 111, 114 (1977). Section

433 of the Restatement sets forth a method of determining whether negligent conduct is a substantial factor in producing the injury. According to the Restatement:

> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]
>
> (c) lapse of time.

§ 433 of Restatement (Second) of Torts; *Brown*, 760 A.2d at 869; *Vattimo v. Lower Bucks Hops., Inc.*, 465 A.2d 1231, 1233-34 (Pa. 1983).

Here, the evidentiary record simply fails to demonstrate a legally sufficient causal connection between the agreement between Defendant Live Nation and Hanover Township to utilize police officers and the alleged harm. As noted above, there is no evidence that Defendant Live Nation induced the decision of the police officers to initiate criminal proceedings against Lindsay Cahill. Plaintiff argues that enforcing the "in house rules" of the Post-Gazette Pavilion, rules established by Defendant Live Nation, essentially criminalized what was otherwise lawful behavior, and that a violation of those rules led to the alleged harm suffered. However, Plaintiff's theory of recovery both miscasts the authority by which Lindsay Cahill was cited, and overlooks a number of factors that contributed in producing the alleged harm.

There is no dispute that Lindsay Cahill was cited for disorderly conduct in violation of 18 Pa.C.S.A. § 5503(a)(4). That statute states in relevant part:

§ 5503. **Disorderly conduct**

(a)     Offense defined. – A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

…

(4)     creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

…

(c)     Definition. – As used in this section the word "public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public.

18 Pa.C.S.A. § 5503.   As such, it is the express statutory language of the Pennsylvania Consolidated Statutes that authorizes the initiation of the criminal process for disorderly conduct in 'places of business or amusement' such as the parking and ingress/egress areas of the Post-Gazette Pavilion.   Furthermore, the citation issued to Lindsay Cahill itself alleges acts that fall within the definition of disorderly conduct, namely, failures to obey orders from Defendant Officer Zoller to exit the lane and not to enter the vehicle, as well as "screaming" profane language.   For her part, Lindsay Cahill admits she crossed a lane of traffic in the parking area as she walked to the vehicle that was returning to pick up her, which was being driven by her sister at the time.   *See* Doc. No. 75, Def. Live Nation's App., at Depo. Tr. of Lindsay Cahill, Tr. pp. 63 – 66.   When the vehicle reached her, it stopped in place in a traffic lane in order to allow her to enter, which she did.   *Id*.   She admits that she heard "an officer yelling" as she was traversing one lane of traffic, specifically "yelling at me to get out of the fire lane", and that upon hearing that, she ran to, and entered, the vehicle driven by her sister.   *Id*. at Tr. p. 63 - 64.   Once again, the Court is not attempting to reconcile the variations between the officers and Lindsay Cahill in the

description of what occurred; however, under either version, there were factors that contributed to the alleged harm for which Defendant Live Nation is not responsible, including: 1) the explicit language of the Pennsylvania statute, 2) the path of return followed by the vehicle being driven by Lindsay Cahill's sister into the parking area, 3) Lindsay Cahill's act of crossing one lane of traffic in order to board the vehicle, 4) the comments directed to Lindsay Cahill by Officer Zoller regarding her presence in the lane of traffic she was in the process of crossing, and 5) Lindsay Cahill's entry in the stopped vehicle after hearing the comments from the officer. Nothing within this sequence suggests the creation by Defendant Live Nation of a force in continuous and active operation up to the time of the alleged harm that produced the harm.

While Plaintiff may recast the applicable section from the Pennsylvania statute as nothing more than an "in house rule" of the Post-Gazette Pavilion, and at the same time overlook the specific acts of all individuals involved immediately preceding the alleged act resulting in the harm, the Court cannot. Accepting the facts in the light most favorable to the non-moving party does not include not accepting facts unfavorable to the non-moving party. The extent of Defendant Live Nation's conduct in this scenario is limited to the contractual relationship. That relationship provided that Hanover Township would provide part-time police officers for the events occurring that summer at the Post-Gazette Pavilion. *See* Doc. No. 75, Def. Live Nation's App. at exhib. B. Such action, when viewed within the context of all of the subsequent occurrences, is sufficiently remote that the Court finds that the record fails to demonstrate proximate causation on the part of Defendant Live Nation for the alleged harm, and summary judgment will be entered accordingly.

Even if the record created a genuine issue of material fact with respect to proximate

causation, summary judgment would nevertheless be appropriate given the status of the officers as independent contractors. While an employer may be held responsible for the negligence of its employees, it will not be responsible for harm caused by the acts of an independent contractor. *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 785 (3d Cir. 1978). The legal distinction between independent contractors and employees is well established. "The characteristic of the former relationship is that the master not only controls the result of the work but has the right to direct the way in which it shall be done, whereas the characteristic of the latter is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result." *Feller v. New Amsterdam Cas. Co.*, 363 Pa. 483, 70 A.2d 299, 300 (Pa.1950). "It is not the fact of actual interference or existence of control by the employer, but the existence of the right or authority to interfere or control which renders one a servant rather than an independent contractor." *Id.* "It is the exclusive function of the jury to determine, under the evidence, the precise nature of the relationship, except where the facts are not in dispute, in which latter event the question becomes one for determination by the court." *Id.*

In view of the facts of record not in dispute, the Court finds that the relationship between the Hanover Township police officers and Defendant Live Nation to be that of independent contractors, as opposed to employees for the purpose of attaching liability. An express provision within the agreement describes the relationship as follows:

> Both the Township and PP[4] intend that an independent contractor relationship be created by and through this Agreement. None of the officers provided by the Township to PP shall be deemed to be agents, servants or employees of PP. No

---

4      "PP" refers to Pavilion Partners, a Texas general partnership, d/b/a Post-Gazette Pavilion at Star Lake, a signatory to the agreement with Hanover Township, and the agreement to which Defendant Live Nation includes itself as a party for the purpose of this litigation. The line of distinction between Pavilion Partners and Defendant Live Nation is never made clear with precision within the record, although there is no dispute that Defendant Live Nation is subject to the terms of the agreement.

employee, agent, officer, or servant of the PP shall in any way be considered agents, servants or employees of the Township.

*See* Doc. No. 75, Def. Live Nation's App. at ¶ 9 of exhib. B. Notwithstanding this provision, however, Plaintiff contends that the degree of control over the performance of the work that was retained by Defendant Live Nation established an employer/employee relationship, as opposed to an independent contractor relationship.

In addressing the issue of retained control of an employer over an independent contractor, Pennsylvania courts consider section 414 of the Restatement (Second) of Torts, which states in relevant part:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965) (emphasis added) (Section 414). The Comments explain what is meant by retained control, distinguishing it from other legal relationships, such as the legal relationship governed by the law of agency.[5] The retained control exception usually applies in the situation where a general contractor fails to use reasonable care in supervising its subcontractors.[6] In relevant part, Comment c. of section 414 explains the requisite degree of

---

[5]    Comment a. of section 414 states:

a.    If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

[6]    Comment b. of section 414 states:

b.    The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor

control as follows:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. *It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*

Section 414 cmt. c (emphasis added).

Here, there is no evidence to suggest that Defendant Live Nation retained sufficient control over the police officers upon which they should be regarded as employees as opposed to independent contractors. Beyond the express language of the agreement noted *infra*, the evidentiary record contains sworn deposition testimony further demonstrating the limits of control by Defendant Live Nation over the police officers. Included in the record was the testimony of Michael Gentile, the general manager at the Post-Gazette Pavilion and Senior Director of Operations for Live Nation, who testified that the Hanover Township police officers assigned to work at the Post-Gazette Pavilion were to act as regular police officers would act, and that he did not control, or have the right to control, the manner in which they performed their duties. Doc. No. 102 at tr. pp. 100 – 101 of exhib. M. The nature of the relationship between the police officers and the Pavilion staff was similarly and consistently described in the same terms by the other deponents found within the record, including Post-Gazette Pavilion event staff assistant Etta

---

entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so.

Barnabei, *id*. at tr. p. 83 of exhib. N, former Post-Gazette Pavilion general manager Lance Jones, *id*. at tr. pp. 63, 82-86 of exhib. Q, and Defendant Chief Geho, *id*. at exhibits R & T.

While not briefed by either party, the Court notes one exception to the general rule that employers are not responsible for torts committed by independent contractors. Pennsylvania courts have recognized the doctrine of ostensible agency in certain factual situations. Factual scenarios lending themselves to ostensible agency are found in medical malpractice litigation; *see e.g., Capan v. Divine Providence Hospital*, 287 Pa.Super. 364, 430 A.2d 647 (1980)(the theory is applicable to hospitals when hospitals engage the services of physicians on an independent contractor basis) and *Boyd v. Albert Einstein Medical Center*, 377 Pa.Super. 609, 547 A.2d 1229 (1988)(the doctrine of ostensible agency was made applicable to HMOs). As the Pennsylvania Supreme Court noted in *Capan*:

> As a general rule, an employer is not liable for torts committed by an independent contractor in his employ. We have, however, recognized an exception to the general rule, stated in section 429 of the Restatement (Second) of Torts, which provides that one who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

*Capan*, at 648 (citations omitted). It is important to note one key aspect of ostensible agency that lends itself to the arena of medical treatment, and conversely, is inapplicable to the factual circumstances at bar. Ostensible agency is found where the aggrieved plaintiff actively seeks services provided by an independent contractor (such as a particular doctor) by way of approaching the "employer" (i.e., a particular hospital) in order to obtain those services. To that end, the Pennsylvania Superior Court explained:

> Under the doctrine of ostensible agency, a hospital [or HMO] may be held liable for the negligent acts or omissions of an independent doctor. Pennsylvania courts have

23

> determined that the two factors relevant to a finding of ostensible agency are: (1) whether the patient looks to the institution, rather than the individual physician for care and (2) whether the hospital 'holds out' the physician as its employee.

*Goldberg ex rel. Goldberg v. Isdaner*, 780 A.2d 654, 660 (Pa.Super.2001)(internal citation omitted).   In this case, there is no evidence upon which ostensible agency can be established. The officers, Zoller and Haschak, were there to serve as Hanover Township police officers, and were engaged in the control of the flow of traffic at the conclusion of the concert, at the time of the alleged interaction with Lindsay Cahill.   Nothing within those two undisputed facts suggests the notion that they were 'held out' by Defendant Live Nation as employees of Live Nation.   It is just the opposite; Live Nation hired Hanover police officers to be seen as Hanover police officers for the purpose of maintaining a degree of order at the event.   *See, e.g.*, Doc. No. 102 at exhib. Q, deposition transcript of former general manager Lance Jones, tr. p. 63 ("That's what we hired them for, you know, the arrest powers and the deterrent factor and traffic detail.")

In sum, the evidentiary record fails to demonstrate any basis for liability for Defendant Live Nation under the two alleged state law counts, and summary judgment in its favor will be granted.

C.  Section 1983 liability of Defendants Hanover Township and Chief Geho

Plaintiff brings a section 1983 claim against Defendants Hanover Township and Chief Geho (collectively referred to as the "Township Defendants") alleging a violation of the substantive due process clause of the Fourteenth Amendment.   Doc. No. 39 at ¶¶ 49 – 53. Beginning with Hanover Township, the Court notes that section 1983 claims against a municipality differ from those against individual officials.   In *Monell v. New York City Dept. of Social Services*, *infra*, the Supreme Court decided that a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue; more

specifically, where a plaintiff identifies either "a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.* at 690–91; *see also, Watson v. Abington Township*, 478 F.3d 144, 155 (3d Cir.2007).

Policy is made when a "decisionmaker possessing final authority to establish municipal policy with respect to a given action, issues an official proclamation, policy or edict." *Watson*, 478 F.3d at 155 (quotations omitted). Custom, on the other hand, can be proven "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Watson*, 478 F.3d at 155–156 (quoting *Bielevicz v. Dubrinon*, 915 F.2d 845, 850 (3d Cir. 1990) and *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990)). "In other words, custom may be established by proving knowledge of, and acquiescence to, a practice." *Id.* (quoting *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)). Hence, if a municipal entity can be shown to have tolerated known misconduct by police officers in the past or that its policymakers were aware of similar unlawful conduct in the past but failed to take precautions against future violations and that this failure at least in part caused the injury complained of, it may be liable. *See, City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Watson*, 478 F.3d at 156; *Bielevicz*, 915 F.2d at 851. These standards ensure that municipalities may incur liability only for deprivations resulting from the decisions of "those officials whose acts may fairly be said to be those of the municipality." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Banegas v. Hampton*, No. CIV.A. 08–5348, 2009 WL

1098845, at *3 (E.D.Pa. Apr.22, 2009).

Inadequacy of police training may also serve as the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989). In certain circumstances, municipal decisionmakers may eventually be put on notice that a new program is called for if a program, such as a training program, fails to prevent constitutional violations. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997). In the event of constitutional violations, decisionmakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the "deliberate indifference"—necessary to trigger municipal liability. *Id.* (citing *City of Canton*, 489 U.S. at 390, n. 10, 109 S.Ct. at 1205).

In addition to claims against municipalities, section 1983 claims may be brought against a government official, either in such an official's individual capacity and/or his official capacity. Individual-capacity suits seek to impose personal liability upon an official for actions he takes under color of state law. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Scheuer v. Rhodes*, 416 U.S. 232, 237–238, 94 S.Ct. 1683, 1686–1687, 40 L.Ed.2d 90 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, *infra*, 436 U.S. at 690, n. 55. On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *See*, *e.g.*, *Graham*, 473 U.S. at 166. More is required in an official-capacity action, however, for a

governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation, *id.* (quotations omitted); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. *Monell*, *infra*; *Oklahoma City v. Tuttle*, 471 U.S. 808, 817–818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *id.*, at 827–828, 105 S.Ct., at 2437, 2438 (Brennan, J., concurring in judgment). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983". *Monell*, *infra*, at 694. With this backdrop in mind, the Court will address Plaintiff's claim against the respective Defendants.

In support of his claim, Plaintiff alleges that Defendants Hanover Township and Chief Geho "failed to adequately train, supervise, and/or regulate Hanover Police Officers assigned to provide services at the Post-Gazette Pavilion." *Id.* at ¶ 51. Within the same claim, however, Plaintiff alleges that the violation of constitutional rights "were proximately caused by the custom, practice, and/or policy of defendants Hanover and Geho acquiescing in the violation of citizens' constitutional rights as committed by its police officers hired by Live Nation to provide security services at the Post-Gazette Pavilion", *id.* at ¶ 53, which invokes the language of a traditional "official policy or custom" *Monell* claim. For their part, Defendants Hanover and Geho have moved for summary judgment under either theory of recovery.

Based on the facts of record, there is no evidence to create a genuine issue of material fact regarding the existence of any such custom so permanent and well-settled that it constituted law. In order to survive summary judgment, Plaintiff must at least offer some evidence that the alleged

custom or practice of violating citizens' constitutional rights involved more than a few isolated incidents by one or two inferior officers.   *See Mariani v. City of Pittsburgh*, 624 F.Supp. 506, 511 (W.D. Pa. 1986)(noting that isolated incidents will not establish a pattern of abusive behavior for municipal liability).   Even assuming one was able to identify more than a few isolated incidents, a plaintiff has an additional burden to further show why those prior instances deserved discipline and how the misconduct in those situations was similar to the present one.   *Id.*   On the other hand, in terms of the sufficiency of evidence for an actionable custom of acquiescing in the violation of citizens' rights, the Court notes the decision in *Beck v. City of Pittsburgh*.   89 F.3d 966 (3d Cir. 1996), *cert. denied*, 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997).   In *Beck*, the Court of Appeals for the Third Circuit held that where defendant police officers had been the subjects of five prior complaints of excessive use of force, there was sufficient evidence of a pattern of violent and inappropriate behavior so as to allow the inference that the Pittsburgh Police Department knew of and tolerated the use of excessive force.   *Id*.   In relevant part, the Court of Appeals stated:

> What we have here are not mere isolated events or mere statistics of the number of complaints.  On the contrary, the plaintiff offered in evidence a series of actual written civilian complaints of similar nature, most of them before and some after the Beck incident, containing specific information pertaining to the use of excessive force and verbal abuse by Officer Williams.  All but one of the complaints had been investigated by OPS and had been transmitted through the police department chain of command to the Chief of Police.  [footnote omitted] Thus, he had knowledge of the complaints.  But, under the sterile and shallow OPS system of investigation, each complaint was insulated from other prior and similar complaints and treated in a vacuum.

89 F.3d at 973.

The evidentiary record in this case is much more analogous to *Mariani* as compared to *Beck*.  At most, Plaintiff references extensively one incident involving an individual, Jerrold Lee

Shafran, attending a previous concert at the Post-Gazette Pavilion that apparently occurred on June 6, 2006, and was the subject of litigation in United States District Court for the Western District of Pennsylvania at Civil Action No. 2:07-cv-1160. *See* Doc. No. 89 at exhibits 4, 6, 7, 8, 21, 27, 28, 30, and 33. The litigation in the *Shafran* case, it should be noted, involved claims against Hanover Township Police Officer Robert Patsilevas, who was undercover at the time, and did not involve either Officer Zoller or Haschack. Beyond that, Plaintiff has provided various copies of five different civil action complaints for incidents between patrons and security personnel occurring in and around events at the Post-Gazette Pavilion, *id.* at exhibits 9 – 13; copies of newspaper articles very generally describing litigation associated with the same civil actions, *id.* at exhibits 14 – 17 (including one article at exhibit 17 in which this civil action is described); as well as various statements expressing the observations and opinions of purported witnesses to past events involving physical abuse of Post-Gazette Pavilion attendees by Pavilion security personnel and/or Hanover police officers, *id.* at exhibit 18.

What is lacking from the record, however, is any evidence to establish that these so-called incidents demonstrated the existence of some custom sufficient to hold Defendant Hanover Township liable under section 1983. *Compare*, *e.g.*, *Beck*, 89 F.3d at 973-76 (where the evidence showed that the police's investigatory unit's structure was designed to curtail disciplinary action and testimony and records showing numerous, similar complaints against officers in the same time period); with *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir.1995) (dismissing § 1983 action against municipality because the bases for liability consistent primarily of "vague assertions about the police department's failure to investigate other wrongdoings" and the incident in the case itself); *see also*, *Turner v. City of Philadelphia*, 22 F.Supp.2d 434, 437

(E.D.Pa.1998)(quoting *Tuttle*, *infra*, 471 U.S. at 823-24 ("Absent unusual circumstances, 'proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.'")); *Petrillo v. City of Philadelphia*, 1997 WL 363844, at *3 (E.D.Pa. June 16, 1997) (holding that deposition testimony revealing complaints against named defendants and citation of civil rights cases against city were insufficient to create municipal liability). As such, the evidentiary record simply does not create a genuine issue of material fact as to the existence of any custom sufficient to support a claim of municipal liability against Defendant Hanover Township.

Likewise, to the extent that Plaintiff alleges a separate claim averring Defendant Hanover Township's failure to adequately train police officers was a basis for section 1983 liability. The *Monell* rule that a municipality is not liable under § 1983 unless a policy or custom causes a constitutional deprivation cannot be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the municipality is responsible. *See City of Canton*, 489 U.S. at 390, 109 S.Ct. at 1205. Somewhat similar to the analysis of Plaintiff's state law claims against Defendant Live Nation, the Court considers the element of causation to be key to Plaintiff's claim against the Township Defendants. "The first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, *infra*, 489 U.S. at 385, 109 S.Ct. at 1203. As the plurality opinion in *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) explained:

> Obviously, if one retreats far enough from a constitutional violation some municipal "policy" can be identified behind almost any … harm inflicted by a municipal official; for example, [a police officer] would never have killed Tuttle if Oklahoma City did not have a "policy" of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violations was "caused" by the municipal "policy."

471 U.S., at 823, 105 S.Ct., at 2436. *Cf.* also *id.* at 833, n.9, 105 S.Ct., at 2441, n. 9 (opinion of Brennan, J.); *City of Canton, infra*, 489 U.S., at 389, n.9, 109 S.Ct. at 1205, n.9.

If, as here, no policy or custom facially violates federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382 (citations omitted); *see also City of Canton*, 489 U.S. at 389. Failure to adequately train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations. *See Bryan County*, 520 U.S. at 408-09, 117 S.Ct. 1382; *see also Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Although it is possible to maintain a claim of failure to train without demonstrating such a pattern, the *Bryan County* court made clear that the burden on the plaintiff in such a case is high:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice.

*Id.* at 409, 117 S.Ct. 1382. The Supreme Court has stated that an example of deliberate indifference to an obvious risk is arming officers without training them "in the constitutional

limitations on the use [of the arms.]" *Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197. "To establish municipal liability, Plaintiff must present scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060 (3d Cir. 1991).

In this case, Plaintiff appears to be conflating two practices, the contractual relationship between Defendant Hanover and Defendant Live Nation for the provision of part-time police services during concerts and events, with an allegedly actionable one, that of "acquiescing" to the violation of the constitutional rights of citizens in the course of that contractual relationship. *See* Doc. No. 87 at pp. 11 - 12 ("… Hanover and Chief Geho have an express policy promulgated in conjunction with defendant Live Nation that the so-called 'part-time police officers' under the supervision of Geho in his capacity as the jointly appointed 'Manager' are supposed to use their state conferred police powers, of arrest, use of force, and filing criminal charges, to enforce Live Nation's in-house rules even in instances where the officer has no reason to believe or suspect that there has been a violation of the crimes codes [of Pennsylvania].") Obviously, the existence of a contract on one hand does not necessarily stand for the proposition that every action taken by a participant falls under, or is an expression of, the practice envisioned under the contract. In this regard, there is nothing in the uncontroverted record to support this argument. Under the same facts as set forth in the analysis of the claims involving Defendant Live Nation, the undisputed evidence produced within the record simply does not support Plaintiff's characterization. The policy, as articulated within the agreement itself, and the uncontroverted practice, as described by various witnesses' deposition testimony, is that the police were there to act as police officers, and enforce the laws of Pennsylvania.

Turning to the claim as alleged against Chief Geho, individual-capacity suits seek to impose personal liability upon a government official for actions taken under color of state law. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Scheuer v. Rhodes, 416 U.S. 232, 237–238, 94 S.Ct. 1683, 1686–1687, 40 L.Ed.2d 90 (1974). In this case, Plaintiff cannot maintain a claim against Defendant Chief Geho in his individual capacity. Third Circuit case law recognizes that "(a) defendant in a civil rights action must have personal involvement in the alleged wrongs" in order to be liable. *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir.2003) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). Consequently, a supervisor may be liable under 42 U.S.C. § 1983 for his or her subordinate's unlawful conduct if he or she directed, encouraged, tolerated, or acquiesced in that conduct. *See Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253, 263 (3d Cir.1995); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir.1995). However, the mere assertion "that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did" is insufficient to establish liability. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989). Likewise, a supervisor's mere failure to train, supervise or discipline subordinate officers does not state a basis for a § 1983 claim against the supervisor absent proof of direct participation by the superior in some unlawful conduct. *Mobley v. City of Atlantic City Police Dept.*, No. Civ. A. 97-2086JBS, 2000 WL 363692 at *3 (D.N.J. March 30, 2000) (*citing Brown v. Grabowski*, 922 F.2d 1097, 1119-20 (3d Cir.1990)).

Here, there is no evidence of personal involvement by Chief Geho in the Cahill incident, and therefore, summary judgment is appropriate to the extent Plaintiff's claim is brought against him in his individual capacity.

Likewise, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690, n. 55, 98 S.Ct. at 2035, n. 55. As summary judgment will be entered on behalf of Hanover Township, summary judgment will be entered on the same claim as brought against Chief Geho in his official capacity.

In sum, summary judgment will be entered on behalf of the Township Defendants on the sole count alleged.

## Conclusion

For the reasons hereinabove stated, the Court finds that Plaintiff has not demonstrated by any record evidence that Defendants violated the rights of Lindsay Cahill as protected by the U.S. Constitution, nor that Defendant committed any tort under Pennsylvania common law. Therefore, the Motions for Summary Judgment of Defendants Live Nation, Hanover Township, and Chief Geho will be granted. An appropriate Order follows.

McVerry, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENE CAHILL on behalf of LINDSAY CAHILL, a minor, | ) ) ) | |
| | ) | **2:08-cv-1552** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| LIVE NATION, HANOVER TOWNSHIP, WASHINGTON COUNTY, PENNSYLVANIA, CHIEF GEHO and OFFICER ZOLLER, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER OF COURT

AND NOW, this 27th day of June, 2011, in accordance with the foregoing memorandum opinion, it is ORDERED, ADJUDGED, and DECREED that the MOTION FOR SUMMARY JUDGMENT (Doc. No. 72) filed by Defendant Live Nation Worldwide, Inc., and the MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS HANOVER TOWNSHIP AND CHIEF GEHO (Doc. No. 76) are GRANTED in their entirety.   Judgment shall be entered accordingly.

The caption of this action is hereby amended to read as follows:

| | | |
|---|---|---|
| GENE CAHILL on behalf of LINDSAY CAHILL, a minor, | ) ) | |
| | ) | **2:08-cv-1552** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| OFFICER ZOLLER, | ) | |
| | ) | |
| Defendant. | ) | |

IT IS FURTHER ORDERED that Plaintiff shall file a Pretrial Narrative Statement on or

35

before July 18, 2011.  Defendant shall file a Pretrial Narrative Statement on or before August 8, 2011.

BY THE COURT:


s/   Terrence F. McVerry
United States District Court Judge


cc:     Timothy P. O'Brien, Esquire
        Email: tob@icubed.com

        Jeanette H. Ho, Esquire
        Email: JHH@PbandG.com
        P. Brennan Hart, Esquire
        Email: pbh@pbandg.com

        Jeffrey J. Ludwikowski
        Email: jludwikowski@psmn.com
        Brian J. Headley, Esquire
        Email: bheadley@psmn.com